**UNITED STATES of America,
Appellee,**

v.

**David WILLIAMS, Defendant–
Appellant.**

**Docket No. 02–1643.**

United States Court of Appeals,
Second Circuit.

Argued: Feb. 25, 2004.

Decided: June 10, 2004.

Gary Greenwald, Greenwald Law Offices, Chester, N.Y. (Jacqueline Ricciani, on the brief), for Defendant–Appellant.

Joseph M. Guerra, III, Assistant United States Attorney for the Western District of New York (James P. Kennedy, Jr., As-

sistant United States Attorney, of counsel; Michael A. Battle, United States Attorney, on the brief), Buffalo, NY, for Appellee.

Before: STRAUB, POOLER, and B.D. PARKER, Circuit Judges.

STRAUB, Circuit Judge:

Defendant–Appellant David Williams appeals from the October 16, 2002 judgment of the United States District Court for the Western District of New York (Richard J. Arcara, *Judge*) convicting Williams, following a jury trial, of engaging in a continuing criminal enterprise, money laundering, possession with the intent to distribute cocaine, unlawful possession of firearms, and four counts of unlawfully using a communication facility. On October 4, 2002, Williams was sentenced to, *inter alia,* life imprisonment under 21 U.S.C. § 848(b).

Williams makes several claims on appeal. Most significantly, he argues that his sentence is unconstitutional because his pretrial representation was impaired by an actual conflict of interest that effectively denied Williams the opportunity to enter into a cooperation agreement or other plea agreement with the government. Williams argues that he and his pretrial counsel had engaged in criminal transactions that were relevant to the crimes for which he was convicted, and that this attorney, in an effort to conceal his own wrongdoing, actively discouraged Williams from cooperating with the government.

We conclude that Williams' sentence was imposed in error. All parties have conceded that Williams' pretrial attorney suffered from an actual conflict of interest. We further find that this conflicted representation led to a lapse in representation because Williams' attorney had a self-interested incentive to prevent Williams from cooperating and took no meaningful

steps to approach the government or otherwise explore a cooperation or other plea agreement, even though Williams may very well have had knowledge valuable to the government, especially at the early stages of the proceedings. For example, the government might have valued Williams' knowledge as to the whereabouts of a co-defendant being sought by law enforcement and also might have valued Williams' knowledge as to the criminal activity of Williams' conflicted attorney, who was under investigation for homicide and other crimes during his representation of Williams.

As the case proceeded to trial and conviction with conflict-free counsel, we propose a remedy tailored to fix the constitutional violation associated with the failure of Williams' conflicted counsel to explore a cooperation or other plea agreement with the government. For the reasons discussed herein, we remand to the District Court for resentencing in accordance with this opinion.

## BACKGROUND

On January 6, 1999, Defendant–Appellant David Williams was indicted by a grand jury for his role as a principal administrator in a continuing criminal enterprise that was believed to have been one of the largest suppliers of cocaine in the Buffalo, New York area. The next day, Williams and other participants were arrested. The government executed several search warrants pursuant to which it found, among other things, firearms in residences used by Williams in Buffalo, New York and in Pembroke Pines, Florida.

Soon after his arrest, Williams retained attorney Anthony F. Leonardo, Jr. to defend him against the charges. Leonardo had represented Williams on prior unrelated federal charges and was then representing him on a state weapons charge

100

arising from a traffic stop. During the course of Leonardo's representation of Williams, Leonardo also represented Calvin Cornelious, a drug dealer who allegedly engaged in criminal activities with Williams.

In March 1999, co-defendant Mark Overall, a close confidant of Williams, began cooperating with the government soon after his arrest. Overall implicated Williams in narcotics trafficking and also alleged that Williams and his attorney, Leonardo, engaged in criminal activity together. Specifically, Overall alleged that in the summer of 1998, he saw Leonardo provide Williams with firearms silencers and that, in December 1998, he saw Williams deliver handguns and silencers to Leonardo who was going to have the silencers modified in order to be more effective. Overall also alleged that Leonardo and Williams conspired together to hide a witness who was going to testify against Cornelious in a state rape prosecution. Leonardo represented Cornelious in those proceedings and in a subsequent matter in federal court.

In August 1999, the government made its first motion to disqualify Leonardo from representing Williams, though not on the most obvious grounds. The government sought Leonardo's disqualification because Leonardo was simultaneously representing both Williams and Cornelious. The government alleged that Williams and Cornelious were involved together in drug trafficking and that Leonardo's representation of both presented a potential conflict of interest. This led to a September 29, 1999 *Curcio* hearing, *see United States v. Curcio*, 712 F.2d 1532 (2d Cir.1983), before Magistrate Judge Carol E. Heckman where Williams waived any potential conflict of interest created by the simultaneous representation. At the time of the hearing, the government made no mention

of Overall's allegations against Leonardo. The government asserts that it did not make a public allegation at that time because Overall's allegations against Leonardo had not yet been corroborated.

In the fall of 1999, the government learned that Leonardo was under investigation by the FBI in Rochester, New York and in Cleveland, Ohio concerning allegations that Leonardo was involved in money laundering and narcotics violations. In February 2000, Overall testified before the grand jury where he repeated his claims that Leonardo and Williams engaged together in illegal firearms transactions. On April 24, 2000, Overall pled guilty to three counts in the indictment. The following day, a superseding indictment was filed that added three firearms charges against Williams. Specifically, Williams and his daughter were additionally charged with possession of firearms in furtherance of drug trafficking activity and conspiracy to transport such firearms in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 371, respectively. In addition, Williams was charged with being a felon in possession of firearms. None of these additional charges were based on Overall's testimony concerning the joint criminal activity of Williams and Leonardo.

In May 2000, Anthony Vaccaro, Leonardo's business partner, was murdered with a silenced automatic firearm. Leonardo became the subject of an investigation related to the murder, based in part on Overall's testimony that Leonardo had access to firearms and silencers. Leonardo subsequently made incriminating remarks to a confidential informant that implicated him in the Vaccaro homicide, as well as in drug trafficking activity and money laundering.

The United States Attorney's Office engaged in *ex parte* meetings to bring the allegations of Leonardo's activities to the

attention of the United States District Court for the Western District of New York. Beginning on June 14, 2000, Denise O'Donnell, then United States Attorney for the Western District of New York, met with Chief Judge David G. Larimer of the United States District Court for the Western District of New York to apprise him of the ongoing investigation into Leonardo's criminal conduct.[1] O'Donnell did not at this time mention to Judge Larimer the allegations that Williams and Leonardo had engaged in joint criminal activity.

On the following day, the government again moved to disqualify Leonardo from representing Williams, on the sole grounds that Mark Funk, another attorney in Leonardo's firm, was representing Shanique Williams, the daughter of the defendant. At a *Curcio* hearing before Magistrate Judge H. Kenneth Schroeder, Jr., both David Williams and Shanique Williams waived any potential conflicts of interest stemming from their representation by the same firm. Again, no mention was made of the allegations tying Leonardo to criminal activity with Williams.

In August 2000, United States Attorney O'Donnell met again with Chief Judge Larimer regarding the Leonardo investigation. Judge Larimer advised O'Donnell that he was familiar with the matter based on his review of various electronic surveillance orders related to the investigation. During this meeting, O'Donnell informed Judge Larimer that Leonardo was representing both Williams and Cornelious in separate criminal cases. O'Donnell raised the possibility of alerting the judges presiding over those cases, including Judge Arcara who presided over Williams' case. Judge Larimer subsequently did so, al-

though Judge Arcara does not recall exactly what was said to him nor when the conversation occurred. According to the government, it did not bring evidence of the joint criminal activity between Leonardo and Williams into open court for fear of compromising its investigation into Leonardo's other criminal activities.

On December 29, 2000, Leonardo was arrested on federal drug charges, including one count of using a firearm in furtherance of drug trafficking activity. These charges were brought by the United States Attorney for the Western District of New York, the same office prosecuting Williams. Leonardo ultimately pled guilty to facilitating the murder of his business partner, money laundering, and trafficking in cocaine in August 2001.

On January 8, 2001, the government moved to disqualify Leonardo. In so moving, the government conceded that Leonardo's representation was marred by an actual conflict of interest. As part of its motion to disqualify, the government submitted an affidavit from the prosecuting attorney stating that:

> The government foresees serious ethical, as well as practical, problems in Mr. Leonardo attempting to zealously defend a client, which may include negotiating a plea agreement, by having to deal with the same United States Attorney who has undertaken to convict Mr. Leonardo of charges which, if convicted, would result in a lengthy term of imprisonment for Mr. Leonardo.

This motion was granted, and Williams retained new counsel.

On August 21, 2001, Williams and his new counsel moved to dismiss the indict-

1. As no transcript was made of the conversation, most of what is known about these meetings comes from Denise O'Donnell's affidavit, as well as an affidavit from Assistant United States Attorney Joseph M. Guerra, III. Williams argues that he has been disadvantaged by the failure to maintain a contemporaneous record of these *ex parte* meetings.

ment, asserting principally that Williams' Sixth Amendment right to counsel was violated because of Leonardo's conflict of interest. Williams also asserted violations of his speedy trial right and his due process right to be free of outrageous prosecutorial tactics. The motion was denied on October 1, 2001, and the matter proceeded to trial on November 26, 2001.

After a jury verdict, Williams was found guilty of (1) engaging, as one of several principal administrators, in a continuing criminal enterprise, in violation of 21 U.S.C. §§ 848(a) and (b); (2) conducting a financial transaction involving the proceeds of unlawful activity with the intent to promote unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (ii); (3) possessing with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); (4) possessing firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) and (2); and (5) four counts of using a telephone while committing a drug trafficking crime, in violation of 21 U.S.C. § 843(b). Williams was principally sentenced to life imprisonment for the first and third of these offenses, a consecutive term of 5 years' imprisonment on the fourth offense, and a concurrent term of 20 years' imprisonment on the remaining offenses. This appeal followed.

## DISCUSSION

### I. WILLIAMS' SIXTH AMENDMENT RIGHT TO COUNSEL WAS VIOLATED

■ The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. This right to counsel includes a "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia,* 450 U.S. 261,

271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *see also Cuyler v. Sullivan,* 446 U.S. 335, 345, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Whether a defendant's representation " 'violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed *de novo.*' " *Triana v. United States,* 205 F.3d 36, 40 (2d Cir.2000) (quoting *United States v. Blau,* 159 F.3d 68, 74 (2d Cir.1998)), *cert. denied,* 531 U.S. 956, 121 S.Ct. 378, 148 L.Ed.2d 292 (2000).

■ We group attorney conflicts of interest into three general categories. The first category describes those conflicts that are so severe that they are deemed *per se* violations of the Sixth Amendment. Such violations are unwaivable and do not require a showing that the defendant was prejudiced by his representation. *See United States v. Fulton,* 5 F.3d 605, 611 (2d Cir.1993); *United States v. John Doe No. 1,* 272 F.3d 116, 125 (2d Cir.2001), *cert. denied sub nom. Findley v. United States,* 537 U.S. 851, 123 S.Ct. 204, 154 L.Ed.2d 82 (2002); *Armienti v. United States,* 234 F.3d 820, 823 (2d Cir.2000). By contrast an *actual* conflict of interest occurs when the interests of a defendant and his attorney "diverge with respect to a material factual or legal issue or to a course of action." *United States v. Schwarz,* 283 F.3d 76, 91 (2d Cir.2002) (internal quotation marks omitted). To violate the Sixth Amendment, such conflicts must adversely affect the attorney's performance. *See United States v. Levy,* 25 F.3d 146, 152 (2d Cir.1994). Lastly, a client's representation suffers from a *potential* conflict of interest if "the interests of the defendant may place the attorney under inconsistent duties at some time in the future." *United States v. Kliti,* 156 F.3d 150, 153 n. 3 (2d Cir.1998). To violate the Sixth Amendment such conflicts

must result in prejudice to the defendant. *Levy*, 25 F.3d at 152.

## A. Per Se Conflict of Interest

As noted, a *per se* conflict of interest requires "automatic reversal without a showing of prejudice." *John Doe No. 1*, 272 F.3d at 125. So far, we have found such conflicts of interest only where trial counsel is not authorized to practice law and where trial counsel is implicated in the "same or closely related criminal conduct" for which the defendant is on trial. *Fulton*, 5 F.3d at 611; *see also United States v. Cancilla*, 725 F.2d 867, 869–71 (2d Cir. 1984) (holding that a conflict of interest existed where defense counsel had, unknown to defendant, engaged in the same types of insurance fraud schemes for which the defendant had been convicted); *cf. John Doe No. 1*, 272 F.3d at 125 ("[W]e have limited *per se* conflicts to two instances: (1) where trial counsel is not authorized to practice law or (2) where counsel is implicated in the crime for which the defendant is on trial.").

In *United States v. Cancilla*, 725 F.2d at 868, an allegation was made after trial, assumed to be true on appeal, that unknown to the defendant, the defendant's trial counsel "may have himself conspired with someone connected to the" fraudulent insurance scheme used by the defendant. We held that a *per se* conflict of interest existed. *Id.* at 871. Given "the similarity of counsel's criminal activities to [the defendant]'s schemes and the link between them, it must have occurred to counsel that a vigorous defense might uncover evidence or prompt testimony revealing his own crimes." *Id.* at 870. As a *per se* conflict, we did not need to find particular areas where his representation suffered. We noted, however, a variety of ways in which the defendant may not have received a vigorous defense citing, as

Williams does, the likely impact of counsel's conflict during pretrial proceedings. *Id.* In *Cancilla*, we found it difficult, for example, "to see how counsel conflicted in this way could impartially have given [the defendant] advice on whether or not to take a guilty plea, since counsel might have feared that acceptance of a plea would turn on [the defendant]'s cooperation, which might lead to discovery of the link to counsel's own activities." *Id.*

In *United States v. Fulton*, 5 F.3d 605, we reaffirmed the application of the *per se* conflict rules to cases where a defendant's counsel is implicated in crimes similar to those of the defendant. Following a jury trial, Fulton and three co-defendants were convicted of a variety of offenses related to a scheme to smuggle heroin. *Id.* at 606–07. During cross examination by Fulton's lead counsel of a particular co-defendant who was a government witness, the government objected and sought an *ex parte* sidebar with the court. *Id.* at 607. At sidebar, the government explained that the witness had several weeks earlier informed the government that "with respect to a previous shipment of heroin he brought into the United States ... that this defense attorney received a portion of the heroin." *Id.* (quoting from the record). The government made clear that this was still just an unconfirmed allegation, but nevertheless, the court acknowledged its obligation to disclose the conflict to Fulton. *Id.* As we noted, "[t]he district judge stated that if the investigation [into the attorney's conduct] was of such importance that the government objected to the disclosure of the allegation, the government might have to choose between pursuing Fulton or his attorney." *Id.* The government decided to press on, and so the District Court informed Fulton and his lead attorney, in significant detail, why this attorney had a conflict of interest. *Id.* at 607–08. After affording Fulton the opportunity to consid-

er this conflict and whether or not he wanted to continue to be represented by this attorney, Fulton chose to waive the conflict and was subsequently convicted. *Id.*

When Fulton sought habeas relief, claiming that the conflict of interest deprived him of his Sixth Amendment right to counsel, the petition was denied. *Id.* at 608–09. This Court reversed, however, finding that Fulton's attorney suffered from a *per se* conflict of interest which was unwaivable. *Id.* at 612–614. We held that where it is alleged that defense counsel engaged in the same or similar crimes for which a defendant stood trial, the conflict "so permeates the defense that no meaningful waiver can be obtained." *Id.* at 613. "In such a case, we must assume that counsel's fear of, and desire to avoid, criminal charges ... will affect virtually every aspect of his or her representation of the defendant." *Id.* While *Fulton* involved a defendant whose conflicted attorney proceeded through trial and sentencing, we noted how the conflict likely affected the defendant's pretrial representation:

> At the pre-trial stage, counsel's ability to advise the defendant as to whether he or she should seek to cooperate with the government is impaired. Cooperation almost always entails a promise to answer truthfully all questions put by the government.... In such circumstances, counsel is hardly an appropriate negotiator of a plea and cooperation agreement. Counsel's judgments about potential defense strategies may be affected by the fear that evidence concerning counsel's involvement might come out....

*Id.* Based on the attorney's powerful self-interest in avoiding criminal liability, we determined that the conflict in this case was unwaivable:

> Given the breadth and depth of this kind of conflict, we are unable to see how a meaningful waiver can be obtained. The conflict here involves a bias arising out of counsel's powerful self-interest in avoiding criminal charges or reputational damage and is thus of a different character than other conflicts.... Advice as well as advocacy is permeated by counsel's self-interest, and no rational defendant would knowingly and intelligently be represented by a lawyer whose conduct was guided largely by a desire for self-preservation.

*Id.* Lastly, although the government was aware of the allegations weeks before its witness testified at trial, it was not until trial that the government informed the court about the issue. Hence, we admonished the government in "future cases [to] immediately inform the court of the existence of such a conflict once it becomes aware of it." *Id.*

In some ways, the conflict affecting Williams' representation treads more upon Sixth Amendment concerns than the one in *Fulton*. In the case at bar, the government had far more than mere allegations that *Leonardo* was engaged in criminal activity, as the government's investigation increasingly corroborated Overall's allegations. Thus, it is more likely that Leonardo, as opposed to Fulton's attorney, in fact, had something to hide. Nevertheless, Leonardo represented Williams in this matter for approximately two years. In addition, the court below did not apprise Williams of the conflict of interest soon after learning of it, as it did in *Fulton*. And while it is unclear from *Fulton* exactly what the nexus was between the attorney's alleged criminal conduct and the defendant's alleged criminal conduct, the Court made clear that the crimes need not be identical. *See id.* at 613 (noting that waiver is inappropriate where a defendant's

attorney is "implicated in *related* criminal activity") (emphasis added).

On the other hand, Fulton's conflicted representation extended through trial, while Williams' did not. Furthermore, this case is perhaps distinguishable from *Fulton* because it is clear in this case that Williams knew of his attorney's criminal activities. Some of our cases note that the *per se* rule has only been applied where the client is unaware of his attorney's underlying conflict. *See United States v. Rondon,* 204 F.3d 376, 379–80 (2d Cir.) (stating that "we have applied the *per se* rule in only two situations: when, *unknown to the defendant,* counsel was, at the time of representation, (1) not duly licensed to practice law because of a failure ever to meet the substantive requirements for the practice of law or (2) implicated in the defendant's crimes") (internal quotation marks omitted; second emphasis added), *cert. denied,* 531 U.S. 915, 121 S.Ct. 271, 148 L.Ed.2d 197 (2000); *Solina v. United States,* 709 F.2d 160, 167 n. 9 (2d Cir.1983) (applying the *per se* rule where a defendant's attorney was unlicensed without extending its applicability to "those cases in which the defendant knew of his representative's unlicensed status"). However, though we have never held the *per se* rule applicable where a defendant is aware of his attorney's related criminal activities, we have also never held it *inapplicable.* *Fulton* may cast doubt on a requirement that defendants be unaware of their attorneys' criminal activity in order for the rule to apply, as it is unclear in *Fulton* whether or not the defendant knew of his attorney's criminal conduct. In any event, such knowledge or lack thereof did not play a role in the decision of the case.

Thus, we consider it unresolved in this Circuit whether the *per se* conflict rules are applicable where the defendant is aware of the facts underlying what would otherwise be a *per se* conflict. In this case, the issue is not properly before us. Though Williams argued below that he suffered from a *per se* conflict in his motion to dismiss the indictment against him, he has chosen not to pursue this argument on appeal. Because he does not press this argument and because we provide relief to Williams on other grounds, we do not reach the issue of whether or not Williams' representation was marred by a *per se* conflict of interest. Nevertheless, the analysis of whether his representation was so hindered informs our analysis of Williams' claims that his representation suffered from an actual conflict of interest which deprived Williams of his right to counsel. *See United States v. Schwarz,* 283 F.3d 76, 96 (2d Cir.2002) (finding the rationale of *Fulton* applicable to actual conflicts of interest).

**B. Actual Conflict of Interest**

█ The District Court, the government, and the defendant agree that Leonardo's representation of Williams was burdened by an actual conflict of interest. Leonardo and Williams made unlawful firearms exchanges during the period of Williams' continuing criminal enterprise, and Williams was indicted for having used firearms to further his criminal activities. Whether or not the crimes for which Williams was indicted involved particular firearms transacted with Leonardo is irrelevant. At least some of Leonardo's criminal conduct was of the same type as at least some of the criminal conduct for which Williams was prosecuted, and the fact that they engaged in that criminal activity jointly provides the necessary link between their crimes. Conceding the actual conflict of interest, the parties only dispute whether this conflict led to a lapse of representation to entitle Williams to relief and whether Williams' retention of Leonardo waived this actual conflict.

### i. Lapse in Representation

■ Once an actual conflict is established, a defendant "need not prove prejudice, but simply that a lapse in representation resulted from the conflict." *United States v. Malpiedi*, 62 F.3d 465, 469 (2d Cir.1995) (internal quotation marks omitted); *see Armienti v. United States*, 313 F.3d 807, 811 (2d Cir.2002). A defendant can prove a lapse in representation by demonstrating "that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *United States v. Levy*, 25 F.3d 146, 157 (2d Cir. 1994) (internal quotation marks omitted). As we stated in *Malpiedi*:

> The test is a strict one because a defendant has a right to an attorney who can make strategic and tactical choices free from any conflict of interest. An attorney who is prevented from pursuing a strategy or tactic because of the canons of ethics is hardly an objective judge of whether that strategy or tactic is sound trial practice. Counsel's inability to make such a conflict-free decision is itself a lapse in representation.

62 F.3d at 469 (internal quotation marks omitted).

■ Williams has demonstrated the requisite adversity in his attorney's performance by showing that his conflicted counsel failed to make any significant effort to negotiate a plea or cooperation agreement on his behalf. Williams claims that Leonardo never discussed the possibility of a plea bargain with him. He further claims that his conflicted counsel actively discouraged him from cooperating, even though many of Williams' co-defendants made cooperation agreements in exchange for substantially reduced sentences. While Williams obviously has an incentive to take this position, even if we do not accept his representations at face value, the government offers but one instance of a very cursory plea discussion with Leonardo and that did not occur until December 22, 2000. This means that the government offers no evidence of any plea discussion or any attempt by Leonardo to engage in a plea discussion until approximately two years after Williams' arrest and one week before Leonardo's arrest. Given that the government knew on December 22, 2000 that Leonardo was about to be arrested, we cannot take seriously any plea discussion the government had with Leonardo at that time, as any agreement could surely have been challenged had it been consummated. Thus, we are left with no evidence that Williams' conflicted counsel ever engaged in a legitimate effort to seek a plea bargain on Williams' behalf. Moreover, it is clear that no plea discussion is alleged to have occurred during the critical months after Williams' arrest when Williams asserts that he had valuable information that he could have offered the government concerning the location of Alvin Jackson, a co-defendant who had not yet been apprehended by law enforcement.

While seeking to make an agreement with the prosecution was surely a "plausible alternative defense strategy or tactic," *Levy*, 25 F.3d at 157 (internal quotation marks omitted), Williams has demonstrated that Leonardo's efforts at plea bargaining were negligible. Williams may have had knowledge of value to the government, and his attorney should have made some effort to explore a cooperation agreement before Williams' information grew stale. Given that Leonardo made no reasonable effort to resolve Williams' case without going to trial and given the strong incentive Leonardo had in preventing a cooperation agreement with Williams, it is clear that Williams' defense was "inherently in

conflict with" Leonardo's "other loyalties or interests." *Id.* (internal quotation marks omitted). Williams has, therefore, demonstrated the requisite lapse in his representation.

The government argues that Williams has not demonstrated the requisite lapse in representation because it maintains that it never had and never would have offered Williams a plea agreement involving a sentence short of life imprisonment. It claims to have pursued such a hardline because: (1) Williams was one of the largest cocaine suppliers in the Buffalo area; (2) it had a very strong case against Williams; and (3) Williams engaged in additional uncharged crimes.

■ The government's argument fails for two reasons. First, Williams has demonstrated the requisite lapse in representation simply by showing that his attorney failed to make any significant effort at plea bargaining when circumstances dictated that he should have. The government's ultimate response to plea efforts that were not attempted is irrelevant. To show a lapse in representation, defendants need not show "that the alternative strategy or tactic not adopted by a conflicted counsel was reasonable, that the lapse in representation affected the outcome of the trial, or even that, but for the conflict, counsel's conduct of the trial would have been different." *Malpiedi,* 62 F.3d at 469.

Second, in any event, we cannot take the government's hardline bargaining position at face value. The government claims that it would not have consented to any sentence short of life imprisonment. Yet, in circumstances like this, it is the job of defense counsel to convince, or at least attempt to convince the government, why that position is unreasonable and not in the government's best interests. In addition, if Williams had a zealous advocate, the government would have had more in-

centive to negotiate a plea agreement and might not have taken such a strong stance against plea bargaining in the first place. Furthermore, even if we accepted the government's representation that it would not have consented to a sentence short of life imprisonment, it is also true that the government might have consented to a plea that involved just one count of conviction leading to life imprisonment, rather than the eight counts for which Williams ultimately was convicted and sentenced. Similarly, even if the government maintained its tough stance, the District Court might not have accepted the government's recommendation as to sentencing were Williams to have pled guilty. Thus, Williams has shown that his representation suffered from an actual conflict and that his attorney's performance demonstrated a lapse in representation that was adverse to Williams' interests.

### ii. Waiver

■ "In most cases when a defendant is faced with a situation in which his attorney has an actual or potential conflict of interest, it is possible for him to waive his right to conflict-free counsel in order to retain the attorney of his choice." *Schwarz,* 283 F.3d at 95. "To preserve the protection of the Bill of Rights for hard-pressed defendants, we indulge every reasonable presumption against the waiver of fundamental rights." *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *see also Wheat v. United States,* 486 U.S. 153, 162, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (citing *Glasser*). In circumstances where we permit defendants to waive conflicts with counsel, the waiver "will be honored if it is knowing and intelligent." *United States v. Blau,* 159 F.3d 68, 74 (2d Cir.1998). Whether waiver of a conflict of interest is "knowing and intelli-

gent depends on the circumstances of each individual case." *Id.*

The government argues that because Williams had knowledge of the underlying facts which led to the conflict at the time he retained Leonardo—namely, Williams had knowledge of the crimes they committed together—Williams waived the conflict when he elected nonetheless to hire Leonardo to represent him. Thus, the government attempts to distinguish Williams' conflict from the conflict in *Fulton* on the sole ground that the defendant in *Fulton* did not know of the conflict at the time he hired defense counsel, whereas in this case, Williams was obviously aware of the crimes the pair previously committed. The District Court found this view persuasive stating, in its decision to deny Williams' motion to dismiss the indictment, that:

> Where, as here, the defendant retains the services of [an] attorney with whom he is engaged in illegal activity, he cannot later claim that his Sixth Amendment rights were violated. It was the defendant, not the government, who created the conflict of interest in this case by retaining the services of an attorney whom he knew to be criminal. To permit the defendant to later accuse the government of failing to timely remedy a conflict that he himself manufactured would essentially reward the defendant for engaging in criminal activity with his attorney. Under these circumstances, the Court finds that Williams knowingly waived his right to conflict-free counsel.

Before considering whether, in fact, Williams waived the conflict of interest by retaining Leonardo, we note three prerequisites to such a determination. First, in order to make a successful waiver argument, it must be the case that the conflict here was *waivable* at all. *See Schwarz,* 283 F.3d at 95 ("An actual or potential conflict cannot be waived if, in the circumstances of the case, the conflict is of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation."). As noted earlier, the facts of this case are similar to those in *Fulton,* where we found that the conflict was not waivable. While *Fulton* involved a *per se* conflict of interest, its reasoning weighs heavily on the facts of this case. Furthermore, in *Schwarz,* 283 F.3d at 91–97, we relied on *Fulton* to find no meaningful waiver of defense counsel's actual conflict of interest based on economic self-interest, despite the fact that the defendant was apprised of the conflict and the risks of waiving it at a *Curcio* hearing. A conflict premised on an attorney's concerns for his own liberty will almost always be more significant than one premised on the kinds of economic interests in *Schwarz.* Thus, to find waiver as to this actual conflict, we would need to believe that the conflict in this case, in the first instance, was waivable at all.

Second, it is undisputed that the government and the Western District of New York had knowledge of the conflict long before Leonardo's ultimate disqualification. Yet, Williams was never informed of the conflict by either the court or the government until the government's disqualification motion on January 8, 2001. We have stated that a district court "is obligated to conduct an inquiry into a potential conflict of interest when 'sufficiently apprised of even the possibility' that a conflict of interest may exist." *United States v. O'Neil,* 118 F.3d 65, 72 (2d Cir. 1997) (quoting *Levy,* 25 F.3d at 153), *cert. denied sub nom. Saia v. United States,* 522 U.S. 1064, 118 S.Ct. 728, 139 L.Ed.2d 666 (1998). "Where the district court fails to make such an inquiry, we have held this to be *per se* reversible error." *Id.; see also United States v. Stantini,* 85 F.3d 9,

13 (2d Cir.), *cert. denied sub nom. Bisaccia v. United States*, 519 U.S. 1000, 117 S.Ct. 498, 136 L.Ed.2d 390 (1996); *United States v. Perez*, 325 F.3d 115 (2d Cir.2003) ("To ensure that a defendant's choice is knowingly and intelligently exercised, the district court, after learning of the possibility of a conflict of interest, determines whether the attorney has an actual conflict, a potential conflict, or no conflict at all. If the court discovers no genuine conflict, it has no further obligation.") (citation omitted). We have significant concerns in this case whether, in fact, the government and the court notified Williams in a timely fashion. Before we could find waiver, we would need to be satisfied that an objection based on waiver can still be raised given the period of time in which both the government and the court had knowledge of an actual conflict, yet took no action to remedy it.

Lastly, as a final precondition to finding waiver, we would need to believe that the government has not precluded itself from making the waiver argument based on its submissions to the District Court. As part of its January 8, 2001 motion to disqualify Leonardo, the government took the position that Williams could not waive the conflict of interest with Leonardo. The government's affidavit in support of its motion states that this was not a "conflict[ ] of interest where a defendant may waive the conflict." The government then cited *Fulton*, 5 F.3d at 613, for the proposition that "[w]here a government witness implicates defense counsel in a related crime, the resultant conflict so permeates the defense that no meaningful waiver can be obtained." It is odd, to say the least, for the government to argue that Williams' conflict was unwaivable at the time of the disqualification motion, yet to argue on appeal that Williams waived the conflict of interest prior to the filing of the disqualification motion.

In this case, we need not resolve whether or not the conflict of interest was waivable, whether the proper waiver procedures were followed, or whether the government has waived the waiver argument because, in any event, we find that Williams did not waive the conflict of interest. It is undisputed that Williams was aware of at least some of Leonardo's criminal activity. However, Williams did not necessarily know the extent of Leonardo's criminal activities, nor did he know that Leonardo was the subject of a grand jury investigation. Thus, even Williams' knowledge of the underlying facts concerning waiver was incomplete. Perhaps, more importantly, even if Williams knew the relevant facts concerning Leonardo's criminal activity, there is no evidence that Williams knew how these facts translate into a conflict of interest. A defendant might believe that defense counsel's status as a former criminal compatriot renders counsel especially trustworthy. In addition, on two occasions the government sought to disqualify Leonardo on other grounds, perhaps leaving Williams with the impression that his relationship with Leonardo was not an impediment to his representation of Williams. In any event, we have no evidence that Williams believed that Leonardo's representation would suffer from an actual conflict of interest.

We are aware, of course, of the potential to abuse the system by hiring conflicted counsel in order to have an opportunity to contest the effectiveness of that counsel should a court or jury resolve matters unfavorably for a defendant. Implicit in such attempts to game the system, however, is an understanding that a defendant could challenge the effectiveness of counsel based on the conflict of interest. Any defendant attempting such a scheme is implicitly aware that the underlying facts

constituting the conflict can translate into a judicially-recognized conflict of interest. Thus, if there were any evidence at all that Williams was seeking to exploit the conflict of interest rules by retaining conflicted counsel, we would treat the case quite differently, as we might have been able to infer the possibility that the defendant could translate the underlying facts constituting the conflict into knowledge of the conflict itself. *Cf. Bridges v. United States,* 794 F.2d 1189, 1194 (7th Cir.1986) (assuming as true defendant's allegation that his attorney engaged in criminal activity related to the defendant, defendant's right to counsel was not violated as the defendant sought "to benefit from his own informed choice of" conflicted counsel in a manner that "smacks of bad faith and of a deliberate design to lay a groundwork for this appeal when all else had failed").

All of the key parties in the proceedings below, including the government, the court, the defendant's conflicted attorney, and the defendant himself were aware that it was, at minimum, quite likely that Leonardo had engaged in criminal activity related to firearms. Yet, the government and the District Court would blame Williams, the least legally sophisticated party, for failing to take action based on the conflict. This concerns us because "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat,* 486 U.S. at 160, 108 S.Ct. 1692. Thus, we refuse to find that merely by retaining Leonardo, Williams, in fact, waived his right to unconflicted counsel in circumstances where the government and the court permitted the conflict to go on without apprising Williams that the underlying facts of the conflict would almost certainly impair Leonardo's ability to represent him.

*iii. Remedy*

■ Having found that Williams' pretrial representation was marred by a conflict of interest in violation of the Sixth Amendment, we now turn to the appropriate remedy. Ordering a new trial in this case would be inappropriate, as Leonardo's actual conflict of interest did not affect the conduct of Williams' trial. Nor would a new trial relieve in any way the constitutional error suffered by Williams—ineffective assistance of counsel during the pretrial stage and the possibility that cooperation purposely was not pursued.

It is clear that Williams suffered from a tangible violation of his Sixth Amendment right to counsel during pretrial proceedings. Even though a defendant does not have a right to a plea agreement, we provide relief to defendants who suffer from constitutionally defective counsel during pretrial stages. *See Holloway v. Arkansas,* 435 U.S. 475, 489–90, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (remedying a conflict of interest which "may well have precluded defense counsel ... from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution"); *United States v. Carmichael,* 216 F.3d 224, 227 (2d Cir.2000) (providing relief where ineffective counsel failed to adequately advise defendant whether or not to accept a plea offer); *Boria v. Keane,* 99 F.3d 492, 496 (2d Cir.1996) (same); *Bridges,* 794 F.2d at 1192 ("[T]he right to conflict-free counsel encompasses all stages of the criminal proceeding.").

Our remedy in this case is similar to the remedy imposed in *Carmichael.* In that case, we stated that "a finding of ineffective assistance requires a remedy specifically tailored to the constitutional error." 216 F.3d at 227; *see also United States v. Cox,* 245 F.3d 126, 132–33 (2d Cir.2001);

*United States v. Gordon,* 156 F.3d 376, 381 (2d Cir.1998). "That remedy is one that as much as possible restores the defendant to the circumstances that would have existed had there been no constitutional error." *Carmichael,* 216 F.3d at 227.

In *Carmichael,* where a defendant's delay in accepting a plea offer was the result of defense counsel's ineffective assistance, and in which the delay resulted in a less favorable plea agreement, we held that the appropriate remedy was to resentence the defendant "to the terms [the defendant] would have received had he been given proper legal advice." *Id.* at 227. We cautioned, however, that a lesser sentence was not inevitable as the District Court on remand would have to inquire, at an appropriate hearing, as to the terms of the agreement the defendant could have received, whether the defendant would in fact have accepted the plea, and even whether the district court would have followed the sentencing recommendations contained in the agreement. *See id.*

We similarly hold that Williams is entitled to be resentenced "to the terms [he] would have received had he been given proper legal advice." *Id.* We acknowledge that this will be a difficult task, and the District Court ought to gather any evidence needed to reconstruct the likely result Williams would have obtained had he not had conflicted counsel. For example, the court might hear evidence as to the relative culpability of co-defendants who did enter into plea agreements as well as evidence concerning Williams' assertion that he had knowledge that would have been valuable to the government, especially knowledge of the whereabouts of a missing co-defendant.

As in *Carmichael,* we caution that it is possible that Williams' sentence ought not be reduced at resentencing. Should the court determine that even if Williams had constitutionally effective counsel after his arrest, the same sentence would have eventuated, then the court may, subject to Williams' opportunity to appeal, impose the same sentence that he, in fact, received after his jury conviction. At a minimum, however, Williams has earned the right to be resentenced in a manner that addresses the constitutionally defective representation that he had for two years.

## II. THE GOVERNMENT'S CONDUCT WAS NOT SO OUTRAGEOUS AS TO WARRANT DISMISSAL OF THE INDICTMENT

We now briefly turn to Williams' remaining arguments. Williams asserts that the indictment against him should be dismissed because the "government and the court made a mockery of [Williams' constitutional] rights when they allowed Williams to be represented by attorney Leonardo, who they knew suffered from an actual conflict of interest, that pitted [Williams' attorney's] own self-interest against that of his client, for nearly two years, and which was akin to no representation at all." Appellant's Opening Brief at 9.

 A defendant has a due process defense to prosecution where (1) the government violates a protected right of the defendant and (2) the government's conduct is sufficiently outrageous. *See United States v. Cuervelo,* 949 F.2d 559, 565 (2d Cir.1991) ("In federal court, if the government violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction," if the government's conduct "reach[ed] a demonstrable level of outrageousness.") (citation omitted; alteration in original); *see also United States v. Chin,* 934 F.2d 393, 398 (2d Cir.1991) ("[T]he existence of a due process violation must turn on whether the

governmental conduct, standing alone, is so offensive that it shocks the conscience.") (internal quotation marks omitted). "A motion to dismiss an indictment alleging outrageous governmental conduct is a question of law directed to the trial judge and review of rulings thereon is *de novo.*" *Cuervelo,* 949 F.2d at 567.

 Even though Williams' right to conflict-free counsel was violated during pretrial proceedings, the government's conduct does not rise to the necessary level of outrage to invoke this defense. Although the government had allegations that Leonardo engaged in criminal conduct for almost two years, it did try to work with the Western District of New York to balance its obligation to notify the court of a conflict of interest affecting Williams and to effectively pursue its investigation of Leonardo. *See United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) ("[W]ithout detracting from the fundamental importance of the right to counsel in criminal cases, we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.").

Even if the government failed to find the perfect balance in this case, conduct sufficiently outrageous to implicate this due process defense involves prosecutorial and investigatory activities far more egregious than what was observed here. *See, e.g., Cuervelo,* 949 F.2d at 565, 568 (remanding for factfinding where there was an "alleged sexual relationship between a principal undercover agent and a person who [was] thereafter charged"); *Chin,* 934 F.2d at 398–99, 399 n. 4 (citing cases where

"extreme physical coercion" may satisfy the outrageousness requirement and suggesting that "psychological torture" might do so as well); *United States v. Sabri,* 973 F.Supp. 134, 147 (W.D.N.Y.1996) (dismissing a charge where the government used as an informant "the defendant's attorney, and . . . the attorney-client relationship was the vehicle used to aide in the informant's ability to obtain admissions from the defendant"); *see also United States v. Berkovich,* 168 F.3d 64, 68–69 (2d Cir. 1999) (noting that a due process challenge to an indictment based on outrageous government conduct has almost never succeeded). In this case, even though the government and the court were placed in an awkward, unusual position, they did not engage in such bad faith tactics under the circumstances to warrant dismissal of the indictment.

## III. WILLIAMS' RIGHT TO A SPEEDY TRIAL WAS NOT VIOLATED

 Williams claims that the delay of nearly three years from his January 6, 1999 indictment to the commencement of his trial on November 26, 2001 violated his Sixth Amendment right to a speedy trial. He argues that the government intentionally delayed seeking a superseding indictment until fifteen months after the filing of the original indictment and further delayed trial by permitting proceedings to go on for approximately two years without seeking disqualification of Leonardo on the most obvious grounds.

To determine whether pre-trial delay represents a constitutional violation, we weigh the factors elucidated by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), namely: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defen-

dant." "We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Davis v. Kelly,* 316 F.3d 125, 127 (2d Cir.) (per curiam), *cert. denied,* — U.S. —, 124 S.Ct. 414, 157 L.Ed.2d 296 (2003). We review the District Court's balancing for abuse of discretion. *See United States v. Anderson,* 902 F.2d 1105 (2d Cir.), *cert. denied,* 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 146 (1990); *United States v. Tantalo,* 680 F.2d 903, 910 (2d Cir.1982).

We find that the District Court did not abuse its discretion when it weighed the *Barko* factors and determined that Williams' right to a speedy trial was not violated. The District Court identified several factors which weighed against a finding of unconstitutional delay. Most importantly, the District Court found that Williams failed to articulate prejudice from the delay with any specificity, only to say that "Witnesses have disappeared; recollections are dim; and the investigation is impaired." Williams has not identified anything more specific on appeal. The court was also skeptical of Williams' speedy trial claim given that his conflict-free counsel had sought its own adjournment of trial and waited seven months from taking on the case before asserting Williams' speedy trial rights. In addition, the court noted the extraordinary complexity of the case and that much of the delay before trial was justifiably required for investigation associated with the superseding indictment and for time spent on discovery and pre-trial motions. While we have already expressed our reservations as

to the government's failure to disclose earlier Leonardo's actual conflict of interest, we do not find that the delay in this case rises to such a level as to violate Williams' right to a speedy trial.

## IV. WE DO NOT REACH WILLIAMS' SENTENCING ARGUMENT

Lastly, Williams argues that the District Court misapplied the sentencing guidelines and relevant Supreme Court precedent when it imposed a life sentence for his conviction of engaging in a continuing criminal enterprise in violation of 21 U.S.C. §§ 848(a) and (b). Because we remand for resentencing, we need not reach this issue.[2]

## CONCLUSION

For the reasons stated, we hereby RE-MAND this case for resentencing in accordance with this opinion.

---

**2.** As a final matter, the government moved this Court to strike portions of Williams' appendix pursuant to Federal Rule of Appellate Procedure 30(a)(1). On May 8, 2003, that motion was denied without prejudice to renewal at oral argument. As the government did not renew this motion at oral argument, we do not address it further.