**06-3104-pr**
**Ventry v. United States**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued:  Apr. 11, 2008                                    Decided: August 15, 2008)

Docket No. 06-3104-pr

_____

JAMES VENTRY,

*Petitioner-Appellant*,

−v.−

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

_____

Before:

CABRANES, WESLEY, *Circuit Judges*, and CASTEL, *District Judge*.[1]

Appeal from an order of the United States District Court for the Western District of New York (Arcara, *C.J.*), entered on June 2, 2006, denying Appellant's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.

VACATED AND REMANDED with instructions for an evidentiary hearing to be conducted by the district court.

_____

_____

[1] The Honorable P. Kevin Castel, of the United States District Court for the Southern District of New York, sitting by designation.

ELEANOR JACKSON PIEL, New York, NY, *for Petitioner-Appellant*.

MONICA J. RICHARDS, Assistant United States Attorney, *for* Terrance P. Flynn, United States Attorney for the Western District of New York, Buffalo, NY.

_____

WESLEY, *Circuit Judge*:

James Ventry appeals from the district court's denial of his 28 U.S.C. § 2255 motion to vacate, set aside, or correct his sentence imposed for witness tampering in violation of 18 U.S.C. § 1512(b). Ventry's habeas petition alleged that his conviction resulted from ineffective assistance of counsel arising from his trial counsel's conflict of interest. In its decision and order below, the district court (Arcara, *C.J.*) denied Ventry's motion without a hearing, concluding that no conflict of interest existed. Because we believe that the district court's conclusion is not supported by the record, we vacate the district court's denial of Ventry's habeas petition and remand for an evidentiary hearing to determine the merits of Ventry's conflict of interest claim.

**Background**

**A.     Factual basis for Ventry's witness tampering charge**

An investigation into an August 1, 1996 attempted armed robbery in the Niagara Falls region of New York led the government to suspect the involvement of Ventry (then a high school history teacher), Wared T. Abdellatif and Robert James ("Bobby") Vitagliano. On September 7, 2000 Ventry was called to testify before a federal grand jury regarding the 1996 robbery attempt. Some time thereafter, he told his then-fiancée, Christine Janik,[2] of his involvement in the robbery

_____

[2] At the time of these events, Christine's last name was Neville. She subsequently married and took the last name Janik. We follow the practice of the district court and refer to her

attempt. FBI Special Agent Robert Utz subsequently interviewed Janik on February 5, 2001. During this interview, Janik recounted what Ventry had told her about his involvement in the robbery attempt, and eventually signed a statement to that effect, prepared by Utz. Janik later described her interview as "unpleasant," due to what she considered to be Utz's sometimes aggressive interrogation technique. Trial Tr. 1860:12-14, Nov. 20, 2002. At one point she also indicated that "the FBI . . . pressured [her] into making a statement." *Id.* at 1873:24-25. Following her February 5, 2001 interview with Utz, Janik called Ventry to inform him of her statement. Later that same day, Ventry and Janik had a confrontation during which Janik told him that she did not want to see him again.

At that time, Ventry had apparently not yet met with or spoken to the attorney subsequently retained by Ventry's father to serve as Ventry's trial counsel – Anthony J. Lana.[3] Ventry did, however, speak to another attorney, Thomas J. Eoannou, on February 5, 2001, in an effort to obtain advice regarding what Ventry had learned from Janik about her FBI interview.[4]

by her married name.

[3] According to Lana's submission in response to a government motion for a hearing on a potential conflict (described by Lana as a "Response to the Government's Motion for Inquiry into a Potential Conflict of Interest *between Anthony J. Lana counsel for Defendant Ventry and Thomas J. Eoannou* for Wared Abdellatif" (emphasis added)), Lana met Ventry for the first time at Ventry's arraignment, before Magistrate Judge Hugh B. Scott on February 7, 2001. Lana Resp. to Gov't Mot. for Inquiry into Potential Conflict of Interest, June 17, 2002, Record on Appeal ("ROA"), Doc. 37. According to the same document, Ventry's father retained Lana as Ventry's counsel on the morning prior to the arraignment. *Id.*

[4] It is somewhat unclear with whom, if anyone in particular, Ventry intended to speak by placing the telephone call eventually answered by Eoannou. In his § 2255 motion before the district court, Ventry stated that "[o]n the night of February 5, 2001, [he] placed a telephone call to Mr. Eoannou to inform him that his ex-fiancé [sic] was threatened into giving [her] statement"

3

It is uncontested that on February 6, 2001 – the day after Ventry's meeting with Janik – Ventry sent the following email message to Janik (redacted by the government to protect Janik's personal information), in which Ventry mentioned his discussion with Eoannou, without referring to Eoannou by name:

> Chrissy, I just want you to know that I spoke to a lawyer last night and they said that if you made that statement under deress that they can not hold you to that and that's all you have to do is call Anthony Bruce who is the prosecutor and tell him that the statement was made under deress and that it is not true and that is what you will say if they make you testifie in front of a Grand Jury. You should get a lawyer to make the call but if you can't just call yourself. He said it is absolutely legal to do and they can not get you in any trouble for it no matter what they say. Anthony Bruce's number is 221-4811 ext. 886. They have not one bit of physical evidence or
>
> Bobby would be arrested for something other than threatening a witness. Also when and if you go to the Grand Jury you can remain silent after you change your statement. Listen I know you hate me but I am a very good person and I know

to FBI Agent Utz. Habeas Mot. 8, App. 118. Ventry's account continued: "Mr. Ventry called Mr. Eoannou to seek *legal advice* as to what could be done since his ex-fiancé [sic] was threatened into giving this statement." *Id.* In his reply brief on appeal, Ventry offers the following account:

> At the time the call by petitioner was made to the law offices of Lana, Eoannou & D'Amico, the petitioner had been arrested, his father had engaged Mr. Lana of the firm as his counsel and the petitioner, without ever having met his lawyer, called the office of that firm. He spoke to Mr. Eoannou who happened to be in the joint office maintained by the two lawyers, practicing law as partners, on a Sunday evening.

Reply Br. 1.
This account of the timing of Ventry's father's retention of Lana as counsel conflicts with Lana's account, which is that Lana was only retained by Ventry's father on February 7, 2001 (a Wednesday), just prior to Ventry's arraignment. Despite all that remains unclear about this telephone call, it is clear – based upon the admissions of both Eoannou and Lana – that Ventry spoke to Eoannou without having previously spoken to Lana. Ventry did so, moreover, by calling a telephone number apparently shared by the two attorneys.

4

you don't want me to go to jail. But I want you to know that if you do this that my lawyer will have to try and destroy your reputation and I will have to tell him [*some potentially embarrassing information about you*]. Now I know your thinking I hate this asshole but believe me I love you more than anything and it would break my heart to ever have to do something like that but I can not go to jail for something I did not do. I'm really sorry for having to say those things to you, I know I've hurt you enough, but I will have no choice. I don't think you understand I can go jail for 13 years and when I get my life will be over. I will be 40 years old, no job, no chance of ever getting married or having kids. So please call him today, I know you were trying to protect me and yourself but its not to late that statement is not binding. Take care of yourself and again I am sorry for saying those things to you. Love always, james

App. 8 (text break and errors appear in the version provided by government).

Ventry was arrested on February 6, 2001, after sending the email, and was arraigned the following day.

In an indictment dated February 15, 2001, Ventry, Abdellatif, and Vitagliano were charged with (1) one count of conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951(a); (2) one count of attempted Hobbs Act robbery, 18 U.S.C. § 1951(a); and (3) one count of using a firearm during the commission of a violent crime, 18 U.S.C. § 924(c). Vitagliano was also charged with several other counts not relevant here, and Ventry was charged in a superseding indictment with one count of witness tampering, 18 U.S.C. § 1512(b), based on his February 6, 2001 email to Janik.

The Janik email also prompted a motion by the government for a hearing on a potential conflict of interest affecting Ventry's counsel. The government's motion asserted that,

[u]pon information and belief, which is based upon conversations with Thomas Eoannou, counsel for defendant Wared Abdellatif, and Anthony Lana, counsel for defendant James Ventry, the "a lawyer" and the "they" who spoke to Ventry and whose "advice" Ventry gave to [Janik] were Mr. Eoannou and Mr. Lana. In the government's view, the advice that Ventry says he received borders on advice

5

that he tamper with [Janik], and thus potentially calls the conduct of Messers Eoannou and Lana into question and might require them to become "unsworn witnesses."

Mot. for Inquiry into Potential Conflict of Interest 2-3, App. 4-5 (footnote omitted).

In essence then, the government was concerned that a conflict might exist between Ventry and his counsel (potentially with respect to both Eoannou and Lana) because one or both of the attorneys may have encouraged Ventry to tamper with a witness.

**B.      The district court's hearing on possible conflict of interest**

In the ensuing hearing conducted by the district court, Assistant United States Attorney Anthony Bruce, as well as Lana and Eoannou, were present. During the hearing, the district court established that Eoannou was the lawyer to whom Ventry referred in the Janik email. Indeed, in response to the court's inquiries, Eoannou twice confirmed that there was "[n]o question" of this fact, and recalled that he was alone in his office when he received the phone call from Ventry. Hr'g Tr. 16:17, 19, June 19, 2002.[5] Furthermore, Eoannou proclaimed that his advice was entirely appropriate. Eoannou said he "[a]bsolutely" wanted the jury to hear his advice, *id.* at 29:23, and "[stood] by the statement," *id.* at 30:1-2. Indeed, the defense theory was that the advice attributed to Eoannou in the first paragraph of the Janik email was legal and proper. As Lana explained, the

defense to count nine is that he says in the email, *if*. . . . He said . . . *if* you made that statement under duress. He didn't say tell them you made it under duress, or let's make this story up. He said if you made it under duress, call [the Assistant United States Attorney].
Furthermore, the email says, call the prosecutor, if this is what happened.

_____

[5] All references to the hearing transcript, unless otherwise noted, are from June 19, 2002.

6

He's not saying let's make up a story, give a statement; he's saying call the prosecutor and tell him that if you made your statement under duress, tell him that. I don't see where there's any impropriety there.

*Id.* at 11:17-12:6 (emphasis added).

In other words, Lana interpreted the statements as innocuous legal advice premised upon a hypothetical assumption – *i.e.*, even taking Ventry's email statement to be a true and accurate reflection of the advice Ventry received from Eoannou, Lana maintained the email could only support an inference that Eoannou had suggested that Janik could claim duress *if* that claim were true. Lana pursued the same defense theory at trial, in both his cross-examination of Janik and in his closing statement,[6] as well as in post-trial argument before the district court.[7] Eoannou,

---

[6] Lana was able to elicit from Janik an admission, during re-cross-examination, that her "statement . . . was, in fact, given under duress." *Id.* at 1970:17-19. In his closing argument, meanwhile, Lana continued to pursue this theme, and asked the jury whether Ventry was "so wrong for the next day sending [Janik] an email saying, look, if you gave it under duress, contact [the Assistant United States Attorney] and tell him." Trial Tr. 72:7-9, Nov. 22, 2002.

[7] In an affidavit attached to a "Notice of Motion" dated December 3, 2002, Lana repeated Ventry's argument regarding the statement in the first paragraph of the Janik email:

This statement, even if made, does not constitute[] witness tampering. At most it constitutes the rendering of legal advice. The defendant is simply reiterating what his lawyer told him about the statement in question and telling the witness to contact [the Assistant United States Attorney]. He does not tell her to make any false statements and, in fact, prefaces his remarks by saying that "if you made the statement under duress". By using such conditional language the defendant is leaving it up to the recipient of the message to determine for herself whether or not the statement was made under duress and, therefore the final decision about whether to speak with the prosecutor is left in her hands.

Notice of Mot. Dec. 3, 2002 ¶ 12, ROA, Doc. 125.

Regarding the second paragraph of the email, Ventry argued that it simply "states that if Janik offers the incriminating testimony against him that his attorney will attempt to discredit her reputation . . . . All of these issues [of potential embarrassment to Janik] are conceivably

7

meanwhile, did not shy away from taking credit for these statements. In his own words, he had no problem with the jury knowing "that I sent the witness to the U.S. [A]ttorney's office to tell the truth." *Id.* at 29:3-4.

With respect to the statements in the second paragraph of the Janik email, however – suggesting to Janik that, if she refused to inform the Assistant United States Attorney that her statement was made under duress, it could lead to certain embarrassing revelations during her trial testimony – Eoannou flatly denied any responsibility. The defense theory regarding *those* statements was that they simply foreshadowed the potentially unfortunate consequences that might result from Janik's cross-examination – the "character assassination" that Lana viewed as the normal collateral damage incident to cross-examination. *Id.* at 22-23.

During the course of the hearing, the focus upon the source of the potential conflict sometimes seemed to drift. Rather than pursuing an inquiry solely into the possible role of counsel in the alleged witness tampering (as had been the original purpose of the government's motion), the district court shifted its attention to the conflict that might arise from Ventry's potentially inconsistent account of his discussion with Eoannou.[8] If Ventry were to testify, the

---

legitimate topics for cross-examination especially from the perspective of a layman." *Id.* ¶ 14.

[8] The district court did occasionally make passing references to the earlier inquiry about the possible role of counsel in the alleged witness tampering, as when it suggested that "[i]n effect, what he's saying, the defendant's saying, is that Mr. Eoannou is involved in witness tampering in a way." Hr'g Tr. 18:16-18. In response to a request from Eoannou to respond to that suggestion, however, the district court clarified its position, saying "I'm not saying there is any of that, and don't take this the wrong way, but I'm saying what is he saying here, in effect?" *Id.* at 18:21-23.

Thereafter, the district court shifted its focus to its concern that Eoannou's credibility may

8

district court reasoned, Ventry's own rendition of his conversation with Eoannou might contradict Eoannou's. For instance, while Ventry may have had an interest in asserting an "advice of counsel" defense, Eoannou may have had a conflicting incentive to suggest that his advice to Ventry was narrower in scope. The court posed the following scenario to Eoannou: "What if the defendant takes the stand and starts contradicting what you allegedly said to him. You become a witness, Mr. Eoannou . . . or an unsworn witness, either on cross-examination of him, or to refute what he says." *Id.* at 15:4-9. The district court explained, further:

> [Ventry] has a right to take the stand. He has a right to say hey, I was operating on my lawyer's advice. I'm just relating to what my lawyer said. And let's assume for the purposes of discussion, that it's a lie, that you never said these things, you never made these claims, okay? Then you possibly become a witness, Mr. Eoannou. Because in effect, he's maybe suggesting that you may have been involved in some activity that you will absolutely deny, and is not true.
> . . . .
> . . . So now you're going to cross-examine him on what the statement is; or, two, you're going to be called as a witness by the Government, to rebut it.

*Id.* at 24:17-25:7.

As the district court saw it, Eoannou's testimony would undoubtedly put his own credibility at issue. In that event, the district court wondered, "[w]hat are you going to do, Mr. Eoannou? You're going to get on that witness stand as the active lawyer in this case, and [the prosecutor] is going to cross-examine you. Your credibility now becomes an issue before the jury." *Id.* at 57:8-12. The government was able to confirm, in fact, that if Ventry did testify, and

---

be put at issue from Ventry's potential testimony – a concern that it repeatedly emphasized was likely to warrant Eoannou's removal from the case. The government proceeded similarly, abandoning the theory that had previously served as the basis for its conflict motion, and adopting the view of the district court that Eoannou's own conduct was not at issue.

9

adopted an "advice of counsel" defense, the government would inevitably call Eoannou as a rebuttal witness.[9]

Significantly, while the district court clearly recognized a possible problem involving Ventry and Eoannou, it dismissed the possibility of a conflict between Ventry and Lana arising from Lana's relationship with Eoannou. Although the two attorneys apparently shared building or office space, and utilized a "firm" name of "Eoannou, Lana & D'Amico," the district court explicitly discounted the possibility of an imputed conflict, stating on the record that it saw no problem in Lana's representation of Ventry:

> Mr. Lana, I don't have such a problem with you, and I don't have a real problem with the – we've had this thing about the two of you sharing office space. I'm not so concerned about that. That doesn't – we've done this many times, and I obviously will have to go into it more on the record as to why.

*Id.* at 25:17-23.

Later in the proceedings, however, the district court evidenced curiosity at Lana's zealous defense of Eoannou's right to remain as Abdellatif's counsel. Lana explained his interest in the most general terms, without ever acknowledging a partnership relationship with Eoannou:

> The Court: Can I ask you a question? Why do you care?
>
> Mr. Lana: Why do I care, Judge? Because I don't want prosecutors intimidating defense attorneys into who can represent who and who can do what and who can't do what.
>
> The Court: This doesn't relate to you though.
>
> Mr. Lana: It does, Judge, because I'm a defense attorney. . . .

---

[9] The nature of this potential defense, and whether it could even have been usefully invoked by Ventry, is a question we take up in more detail in the Discussion section, below.

. . .

The Court: If I don't think there's a problem with the two – the fact that you share an office, okay, and everything else is separate, and we've gone through this issue a number of times, and I think you have successfully persuaded me that there's not a problem, that there is enough of a separation. And let's assume that I don't feel that you have a conflict problem, so you're no longer in it. Why do you care? I mean, you're the champion of defense lawyers in this case?

Mr. Lana: No, Judge, but first of all, I care because it involves my client. Secondly, if something is wrong, and I can speak out to that wrongfulness, why should I keep my mouth shut?

The Court: Do you have any standing to – we're talking about Mr. Eoannou.

Mr. Lana: It's referring to my client and the email that my client sent.

The Court: Whether he stays in the case or not –

Mr. Lana: Ultimately, Judge, again, ultimately you're right, it doesn't affect me.

*Id.* at 41:4-42:14.

The court did not pursue this inquiry further. The hearing concluded with the court agreeing to permit counsel to brief the conflict issue. Eoannou, however, subsequently withdrew voluntarily as counsel to Abdellatif.

### C. Ventry's witness tampering conviction, post-trial motions, sentencing, and direct appeal

Neither Ventry nor Eoannou testified at trial. Ventry was convicted solely on the witness tampering charge, for which he was sentenced by the district court to forty-eight months' imprisonment, to be followed by three years of supervised release. Prior to sentencing, however, Ventry moved, under Federal Rules of Criminal Procedure 29 and 33, for a judgment of acquittal

or a new trial. Lana later amended the Rule 33 motion to add a letter exhibit, submitted by a juror who claimed that the guilty verdict on Ventry's witness tampering charge was the product of juror compromise resulting from time pressure. By decision and order dated February 12, 2003, the district court denied Ventry's post-trial motions.

On direct appeal to this Court, Ventry challenged, *inter alia*, the sufficiency of the evidence for his witness tampering conviction. *See United States v. Vitagliano*, 86 Fed. Appx. 470 (2d Cir. 2004) (summary order). We affirmed Ventry's conviction. *Id.* at 474.

### D. The district court's denial of Ventry's habeas petition

Following his direct appeal, Ventry initiated a collateral habeas corpus proceeding in the district court under 28 U.S.C. § 2255. Ventry's *pro se* "motion to vacate, set aside, or correct sentence," raised, *inter alia*, a claim of ineffective assistance of counsel premised upon allegations of his trial counsel's conflict of interest.[10] Specifically, Ventry alleged that "Mr. Eoannou should have advised Mr. Ventry not to contact his ex-fiancé [sic] since she was now a witness for the government." Habeas Mot. 8, App. 118. Ventry also alleged that he had "called Mr. Eoannou to seek legal advice as to what could be done since his ex-fiancé [sic] was threatened into giving this statement." *Id.* (emphasis omitted). Finally, Ventry argued that, "[s]ince the defendant's lawyer, Mr. Lana, works in the same building and in the same law firm of Eoannou, Lana and D'Amico, there is a crystal clear conflict of interest between Mr. Ventry, Mr. Eoannou, and Mr. Lana." *Id.* at 8-9, App. 118-19.

---

[10] Ventry raised no less than fourteen other claims in his petition with respect to his conviction and sentence. None are relevant here.

In opposition to Ventry's § 2255 motion, the government submitted an affidavit provided by Lana, in which Lana denied the connection to Eoannou alleged in Ventry's motion. Lana's affidavit states:

> I, in fact, work in the same building as Mr. Eoannou (The Cornell Mansion, 484 Delaware Avenue). However, and contrary to Ventry's assertion, I am a sole practitioner and I am not, nor have I ever been, a member of the firm of Eoannou, Lana, and D'Amico. My only relationship with Mr. Eoannou is that he owns the Cornell Mansion and I rent office space from him ("landlord and tenant").

Aff. of Anthony J. Lana at 2 ¶ 7, Gov't App. 42.

In its decision and order below, dated June 2, 2006, the district court adopted Lana's statement, rejecting Ventry's conflict of interest claim in the following two paragraphs:

> Petitioner argues that his sentence should be overturned because a conflict of interest existed between attorney Thomas Eoannou and petitioner's trial counsel, Anthony Lana. Ventry sought legal advice from Eoannou concerning the statements Janik made to the FBI. Although Eoannou did provide some legal advice, petitioner claims that Eoannou should have advised him not to contact Janik, who was, by then, a potential government witness. Petitioner asserts that because Eoannou gave legal advice to him that, in effect, led him to commit a crime, and because both Eoannou and Lana work in the same law firm, there was a conflict of interest. This claim is without merit.
> Even assuming *arguendo* that Eoannou provided bad advice or neglected to provide certain information to petitioner, there was no conflict of interest. As stated in Lana's affidavit, Lana and Eoannou are not in the same law firm. Rather, Lana is a sole practitioner and merely rents office space from Eoannou. The extent of their relationship is landlord/tenant. Therefore, even assuming Eoannou provided petitioner with erroneous legal advice, Eoannou's error cannot be imputed to Lana as petitioner argues. Thus, petitioner's conflict of interest claim fails.

Dist. Ct. Op. at 8-9, App. 157-58.

In an order dated December 1, 2006, a motions panel of this Court granted Ventry a certificate of appealability solely on his claim of ineffective assistance of counsel premised upon

13

the alleged conflict of interest, but dismissed Ventry's other claims as not "ma[king] a substantial showing of the denial of a constitutional right." *See Ventry v. United States*, 2d Cir., No. 06-3104-pr, Order dated Dec. 1, 2006 (quoting 28 U.S.C. § 2253(c)). The panel directed the appointment of counsel for Ventry, and briefing and oral argument followed.

**Discussion**

"On an appeal from the denial of a § 2255 motion, we review a district court's conclusions of law *de novo* but will accept its factual findings unless they are clearly erroneous." *Sapia v. United States*, 433 F.3d 212, 216 (2d Cir. 2005).

"A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *LoCascio v. United States*, 395 F.3d 51, 56 (2d Cir. 2005) (quoting *United States v. Schwarz*, 283 F.3d 76, 90 (2d Cir. 2002)); *see also United States v. Williams*, 372 F.3d 96, 102 (2d Cir. 2004) (noting that the Sixth Amendment "right to counsel includes a 'correlative right to representation that is free from conflicts of interest'") (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). In *Williams*, we identified three particular kinds of counsel-client conflicts: *per se* conflicts, actual conflicts, and potential conflicts. 372 F.3d at 102.

*Per se* "conflicts . . . are so severe that they are deemed *per se* violations of the Sixth Amendment. Such violations are unwaivable and do not require a showing that the defendant was prejudiced by his representation." *Id.* Actual conflicts "occur[] when the interests of a defendant and his attorney 'diverge with respect to a material factual or legal issue or to a course of action,'" *id.* (quoting *Schwarz*, 283 F.3d at 91), and violate the Sixth Amendment when

14

counsel's representation of the client is "adversely affect[ed]" by the existence of the conflict, *id.* (citing *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994)). Potential conflicts exist "if 'the interests of the defendant may place the attorney under inconsistent duties at some time in the future,'" *id.* (quoting *United States v. Kliti*, 156 F.3d 150, 153 n.3 (2d Cir. 1998)), and violate the Sixth Amendment when they "prejudice . . . the defendant," *id.*

Thus, depending on the type of conflict (if any) between Ventry and his trial counsel, the fact that Ventry may not have been prejudiced by the conflict might not cure the conflict of constitutional error. If Ventry could demonstrate, for instance, that there existed an actual conflict between himself and Lana that adversely affected Lana's performance, then the conflict would have been presumptively prejudicial. *See LoCascio*, 395 F.3d at 56. If, on the other hand, Ventry could prove only a potential conflict between himself and Lana, proof of prejudice to Ventry would be required for him to prevail. The nature of the conflict potentially at issue here is not something we can determine on the present record.

Ventry's habeas petition presents three theories for relief, all relating to the Lana-Eoannou business relationship. Before the district court, Ventry identified a potential conflict arising from Eoannou and Lana's possible partnership, and premised his ineffectiveness argument on Eoannou's failure to counsel Ventry against contacting Janik. Habeas Mot. 8-9, App. 118-19. That theory is not before us.

On appeal – with the benefit of appointed counsel – Ventry seeks review of his two remaining (and related) conflict contentions. Ventry's second ground for relief is that "both lawyers should have been barred from further representation of petitioner based on their close

15

association as apparent, if not actual, partners and the fact that one of them gave the advice to petitioner which formed the basis for his conviction on witness tampering charges." Appellant's Br. 8. In other words, Ventry asserts that whatever conflict Eoannou incurred was imputed to Lana.

This claim (as construed by the district court) was premised on an assertion that Eoannou had given Ventry illegal or improper advice; that Eoannou's advice was imputable to Lana because Eoannou and Lana shared the same office; and that Ventry, not knowing such conduct to be illegal or improper, acted upon that advice and proceeded to threaten Janik in "good" conscience. Without resolving this "advice of counsel" defense, the district court rejected Ventry's habeas claim on the basis of its finding that Eoannou and Lana had no partnership relationship.

Although we have significant reservations about the district court's factual resolution of Ventry's second claim, we are hard pressed, as a matter of law, to view Ventry's trial counsel's failure to advance this defense as a basis for concluding that Lana's efforts at trial were ineffective. This defense amounted to an "ignorance of the law" argument, which, by definition, would not have helped Ventry. Ignorance of the law is not usually a defense. Although ignorance of the law may be a defense in certain circumstances, such as when specific intent to violate the law is an element of the crime, *see United States v. George*, 386 F.3d 383, 390-91 (2d Cir. 2004), that kind of specific intent was not an element of Ventry's witness tampering charge. Ventry's habeas claim in this regard is therefore without merit.

That leaves us with Ventry's third conflict claim – Lana's failure to call Eoannou as a

16

witness – and it raises an intriguing question. Assuming (consistent with the district court's conclusion) that Lana and Eoannou were *not* members of the same law firm, Eoannou could have properly testified on behalf of Ventry. Similarly, even if Lana and Eoannou *were* members of the same firm (contrary to the district court's conclusion), there would still have been no problem with Eoannou testifying on Ventry's behalf. An attorney may continue to represent his client even though he, or his partner, may be called to testify on the client's behalf.[11] *See* N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.21(b), (d) [DR 5-102(b), (d)].

Thus, if nothing precluded Eoannou from testifying on Ventry's behalf, why did Lana *not* call Eoannou as a witness? Eoannou, after all, was the individual who could best support the defense Lana employed at trial. Eoannou, furthermore, had vociferously pronounced his eagerness for his advice to Ventry to be presented to the jury. Could Lana's decision not to call Eoannou have arisen from Lana's relationship with Eoannou? If so, this might raise grave conflict concerns.

Throughout the district court's proceedings Lana either failed to mention any partnership relationship with Eoannou (at the conflict hearing) or explicitly denied the existence of a partnership (in his affidavit). Lana insisted that he was merely Eoannou's tenant. While the *actual* state of that relationship may not have been relevant to the quality of defense provided

[11] Under either assumption, however – *i.e.*, whether Lana and Eoannou were partners or not – Eoannou's *adverse* testimony would have been problematic. *See* N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.21(b), (d) [DR 5-102(b), (d)] (West 2007). However, for the reasons discussed above, Eoannou was unlikely to testify adversely to Ventry – or, more precisely, Ventry was unlikely to contradict Eoannou's testimony, since an ignorance of the law defense would have been unavailing to Ventry.

17

Ventry, *representations* concerning the nature of the relationship may have been.

Lana's name appears in the title of the law firm identified in his affidavit submitted by the government in response to Ventry's § 2255 motion. As Ventry notes in his reply brief on appeal – and as is evident from our review of the trial record – Lana signed a trial memorandum, dated November 21, 2002, immediately above the following identifying and contact information:

Anthony J. Lana, Esq.
Eoannou, Lana & D'Amico
Attorney for Defendant, James Ventry
484 Delaware Avenue
Buffalo, New York 14202
(716) 885-2889

Trial Mem. Supp. Reference to Theory of Defense During Summations, App. 81.[12] Letters submitted by Lana to the district court on more than one occasion were typed on letterhead from the law firm of Eoannou, Lana & D'Amico. The top of the letterhead, in bold calligraphic font, identifies the name of the law firm – "Eoannou, Lana & D'Amico" – above a line reading "Attorneys At Law." ROA, Doc. 79.

There is an obvious inconsistency between Lana's use of the "firm" name Eoannou, Lana & D'Amico and: (1) his statement that he is "not, nor [has he] ever been, a member of the firm of Eoannou, Lana, and D'Amico"; and (2) his assertion that he is "a sole practitioner." Aff. of Anthony J. Lana at 2 ¶ 7, Gov't App. 42.

Ventry indicates that he "called the number for his lawyer's office" – *i.e.*, Lana's office –

_____

[12] Our docket (accessible, electronically, through Westlaw) in *United States v. Vitagliano*, 86 Fed. Appx. 470 (2d Cir. 2004) lists similar identifying and contact information for Lana, although the summary order issued in that appeal lists Thomas Theophilos as counsel to Ventry.

and the phone was answered by Eoannou. Appellant's Br. 6. The fact that the phone number dialed by Ventry was answered by Eoannou suggests that the two attorneys share the same law office telephone number.

Public representations of Eoannou and Lana's professional relationship are easily found. For example, an electronic Westlaw profile search for attorneys Thomas J. Eoannou and Anthony J. Lana indicates their membership in the same firm ("Eoannou & Lana") with a shared address and phone number. *See* Profiler - Profiles of Attorneys and Judges (Westlaw Directory: PROFILER-WLD) (Search "Thomas J. Eoannou" or "Anthony J. Lana"). Likewise, a similar Westlaw search of the law firm "Eoannou & Lana" lists "Eoannou, Thomas J." and "Lana, Anthony J." as "Affiliates."

There are many additional public representations of a partnership relationship between Eoannou and Lana. We take note of two: (1) court appearances by Eoannou and Lana on behalf of the law firm of Eoannou, Lana & D'Amico; and (2) apparent political campaign contributions by the Eoannou, Lana & D'Amico law firm.

There have been frequent appearances of the Eoannou, Lana & D'Amico law firm – and, particularly, representation of the firm by Thomas J. Eoannou and Anthony J. Lana – before this Court, as well as before district courts within this circuit, including many appearances before the very district court from whose decision Ventry now appeals.[13]

---

[13] *See, e.g.*, *United States v. Kaid*, 502 F.3d 43, 44 (2d Cir. 2007); *see also United States v. Kaid*, 241 Fed. Appx. 747, 749 (2d Cir. 2007) (summary order); *United States v. Rosa*, No. 07-CR-142A, 2008 WL 1902712 (W.D.N.Y. Apr. 25, 2008) (Thomas J. Eoannou, appearing on behalf of Eoannou, Lana & D'Amico before Arcara, *C.J.*); *United States v. Ozoria*, No. 01-CR-0140, 2008 WL 1840764 (W.D.N.Y. Apr. 22, 2008) (Thomas J. Eoannou, appearing on behalf of

19

The issue of Lana and Eoannou's professional relationship was familiar to that court. Indeed, it appears from the district court's own statements at the conflict hearing that the district court had previously considered Lana and Eoannou's "sharing [of] office space . . . many times," and that the court "obviously [would] have to go into it more on the record." Hr'g Tr. 25:20-23. Although, as far as we have been able to determine, the district court never did supplement the record on this point, it is clear to us that the district court was aware of prior questions concerning the nature of the Eoannou-Lana relationship. Furthermore, in at least one instance, the firm of Eoannou, Lana & D'Amico may have contributed to a political campaign – the

---

Eoannou, Lana & D'Amico before Arcara, *C.J.*); *United States v. Eldridge*, No. 06-CR-311A, 2008 WL 877120 (W.D.N.Y. Mar. 31, 2008) (Thomas J. Eoannou, et al., appearing on behalf of Eoannou, Lana & D'Amico before Arcara, *C.J.*); *United States v. D'Amato*, No. 07-CR-157A, 2008 WL 53290 (W.D.N.Y. Jan. 3, 2008) (Thomas J. Eoannou, appearing on behalf of Eoannou, Lana & D'Amico before Arcara, *C.J.*); *United States v. Moore*, No. 07-CR-59A, 2007 WL 4180739 (W.D.N.Y. Nov. 20, 2007) (Eoannou, Lana & D'Amico appearing before Magistrate Judge Scott); *United States v. Firestien*, No. 04-CR-331E, 2007 WL 174108 (W.D.N.Y. Jan. 19, 2007) (Thomas J. Eoannou, appearing on behalf of Eoannou, Lana & D'Amico before Elfvin, *J.*); *DeJesus v. United States*, Nos. 04-CR-82S, 05-CV-655S, 2006 WL 3359446 (W.D.N.Y. Nov. 20, 2006) (Anthony J. Lana, appearing on behalf of Eoannou, Lana & D'Amico before Skretny, *J.*).

While we cannot fault the district court for not being aware of all of the many appearances of Eoannou or Lana on behalf of the Eoannou, Lana & D'Amico firm *after* June 2, 2006 – the date on which the district court issued its opinion rejecting Ventry's § 2255 motion – at least some of these later cases may have been pending before the district court at the time of Ventry's case. In *United States v. Pike*, No. 01-CR-129A, 2006 WL 1843294 (W.D.N.Y. June 29, 2006) (Arcara, *C.J.*), for example, a decision issued by the district court below in the same month in which it issued the decision that Ventry appeals, Thomas J. Eoannou appeared before the district court as co-counsel on behalf of Eoannou, Lana & D'Amico. The opinion appears to have been issued following oral argument on May 12, 2006, although the extent of Eoannou's participation in that argument is unclear. *Id.* at *1. A separate decision and order was issued by the district court in the same case, dated January 19, 2006. *See United States v. Pike*, No. 01-CR-129A, 2006 WL 146061 (W.D.N.Y. Jan. 19, 2006) (Arcara, *C.J.*). Eoannou, again, was listed as counsel, on behalf of Eoannou, Lana & D'Amico.

20

Committee to Re-Elect Judge D'Amico.[14] *See* N.Y. State Bd. of Elections Fin. Disclosure Report, Comm. to Re-Elect Judge D'Amico at 2, *available at* http://www.elections.state.ny.us:8080/reports/rwservlet?cmdkey=efs_sch_report+p_filer_id=C22 941+p_e_year=2006+p_freport_id=F+p_transaction_code=F.

There is, therefore, a significant amount of public information indicating that Lana and Eoannou regularly presented themselves, not merely as landlord and tenant, but as law partners. The denials of the existence of a partnership despite public representations to the contrary arguably raise legal and ethical questions for Lana, but most importantly, in the circumstances presented here, raise the question of why Eoannou was not called as a witness.

Attorneys are bound by rules of ethics – these rules are the bedrock of the high level of trust and responsibility delegated to the role of counsel in society. The representations attorneys make to the public and to the courts as to their business affiliations may have significant consequences for those who call upon attorneys for advice, or for the courts in determining if an attorney has a conflict of interest. Furthermore, attorneys are expected to know the ethical guidelines that govern their privilege of practicing law. It is in this context that we must examine the open and public representations made by Eoannou and Lana of the existence of their law firm, juxtaposed with their in-court denials of any professional relationship. The task then turns to examining the possible effect those representations may have had on Lana's efforts on

---

[14] We note that New York law requires election campaign contributions to be provided "under [the] true name of [a] contributor," and provides an exception only for partnerships defined as such under New York partnership law. *See* N.Y. Elec. Law § 14-120 (McKinney 2007).

Ventry's behalf.

Under the New York Lawyer's Code of Professional Responsibility, "[a] lawyer or law firm shall not use or disseminate or participate in the use or dissemination of any advertisement that: (1) contains statements or claims that are false, deceptive or misleading; or (2) violates a disciplinary rule." 22 N.Y.C.R.R.§ 1200.6(a) [DR 2-101(a)]. Similarly, under section 1200.7(c), "[a] lawyer shall not hold himself or herself out as having a partnership with one or more other lawyers unless they are in fact partners." *Id.* § 1200.7(c) [DR 2-102(c)]. And, under section 1200.7(b), "[a] lawyer in private practice shall not practice under a trade name." *Id.* § 1200.7(b) [DR 2-102(b)]. An early advisory opinion issued by the New York State Bar Association Professional Ethics Committee considered a question related to the rule now contained in section 1200.7(b): "May several attorneys who share a suite of offices use a firm name and hold themselves out to the public as a partnership when they are not in fact partners?" N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Op. 15 (Oct. 25, 1965), *available at* http://www.nysba.org/AM/Template.cfm?Section=Ethics_Opinions&TEMPLATE=/CM/Content Display.cfm&CONTENTID=17474. The Committee's response:

> The proposed arrangement would be improper. Canon 33 forbids lawyers to use false, misleading, assumed or trade names. The proposed partnership name would fall under this ban since it falsely suggests the existence of a partnership when there is none and in addition the name would be an assumed or trade name.

*Id.*

In short, Lana and Eoannou's representations of partnership in a law firm – if false – may have violated provisions of the Code of Professional Responsibility prohibiting misrepresentation of partnership. On the other hand, if those representations reflect the genuine existence of such a

22

partnership, they would still be inconsistent with Lana's denial of a partnership relationship, and perhaps call into question Lana and Eoannou's candor before the district court.

What, then, of the question Ventry raises in his habeas petition and this appeal? Why did Lana not call Eoannou as a witness? It was obvious early on in the case that the Eoannou-Lana relationship drew the attention of the government and the district court. The government moved to disqualify both attorneys. The court, in resolving that motion, indicated its reluctance to impute Eoannou's possible conflict to Lana, while reiterating that, based on past experience with Lana, the court was satisfied that "there [was] enough of a separation." App. 49-50. Perhaps Lana was concerned that, by calling Eoannou as a defense witness, the government, in cross-examination, would have forced Eoannou to choose between two equally unpalatable options: (1) admitting to public misrepresentations of a partnership relationship with Lana and thereby exposing himself – and Lana – to professional misconduct charges; or (2) admitting to a lack of candor in failing to inform the court of Eoannou's partnership relationship with Lana. Calling Eoannou as a defense witness would have put Eoannou and Lana between the proverbial "rock and a hard place." However, by not calling Eoannou to the witness stand, Lana gave up potentially beneficial testimony for his client. Lana, in short, may have been conflicted. His ultimate choice – to sacrifice Eoannou's testimony rather than place his partner (and himself) in a precarious predicament, may have undermined his defense of his client, to whom Lana had a professional obligation of zealous advocacy.

On the present record, we cannot conclusively resolve Ventry's ineffectiveness of counsel claim. Indeed, the district court should not extrapolate from our analysis that there is only one

23

possible conclusion in that regard. (If that were the case, there would be no reason to remand for a hearing.) We merely note the possibility of a conflict, in resolving this appeal, while recognizing that there may have been well-founded tactical reasons for Lana not to have relied upon Eoannou's testimony. One such reason might have been the fact that, had Eoannou taken the witness stand, the government would have probed Eoannou's earlier statement at the conflict hearing that he had not advised Ventry as to how Janik's past could be used to question her credibility, as reflected in the second paragraph of the Janik email. That testimony, standing alone, could have provided a basis for the jury's witness tampering conviction. At the same time, however, we cannot ignore the equally plausible possibility, on the present record, that Lana's decision arose from his own interest in avoiding scrutiny of his business relationships.

For these reasons, the district court's factual finding that Lana and Eoannou had no professional relationship other than landlord and tenant does not withstand scrutiny. There is no record support for this finding; indeed, the record contains strong evidence that their relationship is far more complex. We therefore cannot conclude that the legal representation Ventry received was untainted by the potentially conflicting obligations of his trial counsel. Accordingly, we vacate the judgment of the district court and remand the case for an evidentiary hearing on the nature of the professional relationship between Lana and Eoannou. The district court should then consider whether any aspect of that professional relationship – including the possible desire to avoid scrutiny of it – may have influenced Lana's decision to not call Eoannou as a witness at Ventry's trial.

Finally, while ordering vacatur and remand to the district court for the purposes of

supplementing the record with any findings elicited from the new evidentiary hearing, the present panel retains its jurisdiction over this appeal. *See United States v. Jacobson*, 15 F.3d 19, 21-22 (2d Cir. 1994); *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1019 (2d Cir. 1975) (Friendly, *J.*).

## Conclusion

The district court's order of June 2, 2006, denying Appellant's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, is hereby VACATED and REMANDED with the above instructions for an evidentiary hearing to be conducted by the district court.